UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

Civil No. 20-_____

| | |
|---|---|
| MR. and MS. DOE, individually and as parents and next friends of JOHN DOE, a minor, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) ) |
| PORTLAND PUBLIC SCHOOLS, | ) ) |
| Defendant. | ) ) ) |

**COMPLAINT**
**(Jury Trial Demanded on Counts II–III)**
**(Injunctive Relief Requested on Count IV)**

Plaintiffs Mr. and Ms. Doe, individually and as parents and legal guardians of John Doe, complain against the Portland Public Schools as follows:

**PARTIES AND JURISDICTION**

1. This action seeks damages for discrimination against the Portland Public Schools under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134 ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). It also seeks recovery of attorney's fees and costs under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.,* as supplemented by Maine's laws regarding the education of exceptional students, 20-A M.R.S.A. § 7001, *et seq.*, and their respective implementing regulations. It also seeks judicial review of one aspect of an administrative decision issued by a Maine

Department of Education hearing officer pursuant to the IDEA, 20 U.S.C. § 1415(i)(2).

2. Plaintiffs Mr. and Ms. Doe (the "Does") are residents of Portland. They are the parents and legal guardians of John Doe, a 10-year-old student with a learning disability.

3. In seeking relief under federal anti-discrimination laws, Plaintiffs have exhausted their IDEA remedies, as required by 20 U.S.C. § 1415(l), by seeking and obtaining an administrative order, in which they were the prevailing parties, from a hearing officer appointed by the Maine Department of Education. This order issued following an IDEA due process hearing conducted pursuant to 20 U.S.C. § 1415(f).

4. In seeking recovery of their attorney's fees and litigation expenses related to the IDEA administrative proceedings, they were prevailing parties as defined by 20 20 U.S.C. § 1415(i)(3).

5. In seeking to reverse a portion of the hearing officer's order under the IDEA, the Does are parties "aggrieved by the findings and decision" of a due process hearing officer within the meaning of the IDEA, 20 U.S.C. § 1415(i)(2)(A).

6. This Court's subject matter jurisdiction is based upon 42 U.S.C. § 12133 (ADA); 29 U.S.C. § 794 (section 504); 20 U.S.C. §§ 1415(i)(2)(A), 1415(i)(3)(A)–(C) (IDEA); and 28 U.S.C. § 1331 (federal question).

7. Defendant Portland Public Schools ("Portland") is the local education agency responsible for providing a free appropriate education to children with disabilities who are residents of Portland, Maine.

8. Portland is a recipient of federal financial assistance for purposes of Section 504 and a public entity for purposes of the ADA.

9. The IDEA administrative hearing in this case involved a dispute between the parties concerning the Portland's failure to provide John Doe with appropriate special education services under the IDEA and Plaintiffs' right to compensatory education, including reimbursement of costs they incurred in connection with their decision to enroll him unilaterally in a private special purpose school.

## LEGAL REQUIREMENTS OF APPLICABLE FEDERAL LAWS

10. The IDEA requires that each eligible child with a disability receive a free appropriate public education ("FAPE"). That statute's "Child Find" provisions require that school districts promptly refer, evaluate, and identify all potentially eligible children with disabilities so they can receive the specialized services to which they are entitled.

11. Section 504 prohibits recipients of federal financial assistance, including Portland, from engaging in intentional discrimination on the basis of disability.

12. Title II of the ADA prohibits a public entity, including a public school district like Portland, from engaging in discrimination on the basis of disability.

## FACTS COMMON TO ALL COUNTS

13. John Doe attended Portland's East End Community School ("EECS") from kindergarten (2015–2016) through third grade (2018-2019).

### **Kindergarten (2015–2016)**

14. John's end-of-year report card from kindergarten at EECS indicated that he was falling short of meeting EECS's grade-specific targets for attaining basic reading and writing skills.

15. Worried that John may need additional literacy instruction, Ms. Doe filled out an Educational Placement Information form as requested by Portland.

16. Ms. Doe's form set forth her concerns about John's literacy development.

### **First Grade (2016–2017)**

17. John continued to struggle to read and write during first grade at EECS (2016-2017).

18. On March 31, 2017, Portland administered a Phonemic Awareness Assessment to John. His scores for rhyming and alliteration were coded as "not competent." The District did not disclose these results to the Does.

19. In April 2017, Portland issued a Progress Monitoring Form, which flagged John's literacy skills and lack of mastery of high-frequency words as areas of concern. This form indicated that John struggled to process the visual (or "orthographic") components of language.

20. Portland scheduled John to work individually with an educational technician twice per week, to receive pull-out services away from his classroom twice per week, and to practice high-frequency words with an AmeriCorps volunteer. Despite these increased services, notes on the monitoring form state that John's reading level did not improve as a result.

21. Portland's May 2017 Progress Monitoring Form continued to list John's deficient reading and writing skills as an area of concern. This form stated that John read at a level below Portland's standard for a student starting first grade. Portland did not share this form with the Does.

22. In June 2017, after reviewing John's end-of-year work and realizing she could not read anything he had written, Ms. Doe called EECS in June 2017 to express her concerns.

23. Ms. Doe subsequently conversed with EECS's principal, Boyd Marley. He advised her not to push John in learning how to read, as he believed that applying pressure might cause John to struggle further.

24. In advance of second grade, Ms. Doe filled out an Educational Placement Information form, in which she suggested that John may need "a professional evaluation to determine if he has dyslexia or some other reason for his difficulties."

25. Portland did not respond directly to this communication from Ms. Doe.

**<u>Second Grade (2017–2018)</u>**

26. John returned to EECS for second grade (2017-2018).

27. On September 12, 2017, the Does sent an email to Principal Marley detailing their concerns. They expressed their belief that John required testing to determine if he had a learning disability, that John's literacy skills at the end of first grade were below the standard for a student starting first grade, and that they had not been made aware of John's struggles until the end of the prior school year.

28. The Does' email disclosed that John wrote some letters backwards and frequently misunderstood words and pronunciation. They expressly asked for Portland to evaluate John as soon as possible to determine if he required specialized instruction to help close the gap between him and his peers.

29. Having received no reply to the email for two weeks, Ms. Doe sent a second email to Principal Marley on September 26, 2017, again asking that Portland evaluate John's literacy skills. Principal Marley responded the next day, indicating that Portland's special education office would be in contact.

30. Portland eventually initiated a special education referral in late September 2017. The referral document stated that John's performance in reading and English Language Arts fell well below expectations.

31. Portland's school psychologist, Dr. Ann Christie, subsequently completed an abbreviated psychological evaluation of John. She sent her report to the Does on December 7, 2017.

32. Although John's literacy deficits had prompted the Does' request for evaluation, Dr. Christie did not assess his ability to read, nor did she explore his apparent underlying processing difficulty in storing and recalling the visual form of letters and words (*i.e.*, "orthographic processing").

33. In general achievement testing conducted by a Portland special educator, John scored in the second percentile for reading comprehension and fluency.

34. On December 14, 2017, despite John's poor achievement scores in areas related to literacy, Portland determined that he was not a student with a specific

learning disability eligible for special education and related services under the IDEA.

35. Feeling pressured to do so, the Does agreed to go along with Portland's determination of IDEA ineligibility for their son.

36. Instead of specially designed instructional services, Portland agreed to provide only what it classified as "response to intervention services" focusing on "attention to task accommodations," "reading foundational skills," and instruction towards memorizing high-frequency words.

37. On February 15, 2018, John's second-grade teacher reached out to the Does to express her concern that he was producing little written work and was struggling to read early first grade texts.

38. John received a score of "1" ("area of concern") for the final two trimesters of second grade in the area of guided reading skills and also for skills related to spelling, punctuation, capitalization, and handwriting during the third trimester.

39. The Does did not witness any improvement in John's reading or writing skills by the conclusion of second grade.

### Third Grade (2018–2019)

40. John returned to EECS for third grade (2018-2019). When assessed that fall for reading skills, his scores fell in only the third percentile for his age.

41. As of December 2018, nearly midway through third grade, John could only successfully read materials there were at about a mid-first grade level.

42. By January 2019, John felt depressed. He considered himself to be "stupid" and expressed a desire to not attend school. He came home with drawings of sad faces with tears streaming down and wrote about how he constantly felt sad.

43. John's declining mental state and increasingly negative attitude towards school weighed on his parents, causing them distress. They began bringing John to counseling sessions to address his apparent mental health concerns.

44. On March 29, 2019, Portland screened John for dyslexia. The screening instrument categorized John as "at risk for dyslexia" and indicated that the next step should be a comprehensive diagnostic evaluation of the student. Portland neither disclosed these results to the Does, nor commenced further evaluation.

45. As their concerns deepened, the Does brought John to the Aucocisco School for an independent evaluation in April 2019. Aucocisco is a non-profit, state-approved special purpose school for students with disabilities.

46. The Aucocisco evaluator determined that John has dyslexia. He struggles with both phonological processing (*i.e.*, encoding and decoding the auditory aspects of language), and orthographic processing. His orthographic deficit is severe.

47. According to the Aucocisco evaluation, John's literacy skills were so delayed that he could not fluently read a pre-primer or primer passage with which he was unfamiliar.

48. The Aucocisco evaluation report recommended that John receive reading intervention targeted both his phonological and orthographic processing deficits using the Lindamood-Bell Seeing Stars instructional program.

49. By May 2019, John was coming home from school crying on a daily basis. He regularly expressed frustration with his lack of progress, calling himself "stupid," "dumb," and an "idiot." In addition, other students increasingly bullied John at school; one peer told other students not to touch John because doing so would make them "stupider."

50. On May 2, 2019, the Does emailed EECS's principal, Boyd Marley, to inform him that John had been attending therapy sessions for months due to the emotional distress caused by his struggles at school and the bullying that resulted.

51. Frustrated with how Portland had abandoned John and utterly failed to provide any instruction that targeted his orthographic processing deficit, the Does submitted a reimbursement notice to Portland's Director of Student Support Services on May 3, 2019. This notice indicated their plan to place John unilaterally at Aucocisco for Seeing Stars tutorials for a portion of each school day beginning May 20, 2019. The notice also requested that John be re-referred for IEP eligibility.

52. On May 6, 2019, Dr. Christie told her colleagues via email that the Aucocisco evaluation did not indicate that John had dyslexia. On May 10, 2019, she communicated to Portland staff that she recalled John to be a bright student who was not engaged in the learning process, indicating that his difficulties were due to his "not feeling challenged more than an inability to do or difficulty with the work."

53. In May 2019, John participated in a Portland "Reading Inventory" assessment. His scores, which were all in the first percentile, qualified him as a "beginning reader."

54. As third grade drew to a close, EECS staff twice attempted to prove that John could read at a level commensurate with a student halfway through second grade. Both assessments had to be aborted because his reading performance was so poor that it could not be scored.

55. John started attending Aucocisco to receive Seeing Stars tutorials for four hours per day on May 21, 2019.

56. John responded positively to this change. He thrived in the 1:1 reading instruction he received at Aucocisco from May through August 2019. By early August, he had learned all English language phonemes in isolation; demonstrated mastery of up to four syllable words for phonemic awareness; made progress in recognizing and understanding roughly 700–800 of the most common sight words; practiced reading in context at a fourth grade level with instructional assistance; and had an estimated independent reading level of a student approaching the halfway point of third grade.

57. The Does signed a consent for evaluation form on August 26, 2019, to facilitate Portland's re-referral of John for IDEA eligibility.

**Fourth Grade (2019–2020)**

58. The Does enrolled John at the Breakwater School, a private school in Portland, for fourth grade. Breakwater offers small class sizes and more individualized attention than EECS, but does not offer special education services.

59. To continue John's specialized reading instruction, the Does engaged a former Aucocisco tutor to provide John with supplemental Seeing Stars instructions

twice weekly. They hoped this combination of individualized attention and specialized instruction would work well for John in fourth grade.

60. EECS Principal Marley completed and submitted a recommendation form in support of John's admission to Breakwater.

61. Breakwater developed a "School Support Plan" to provide John with accommodations for his learning disability. Breakwater also recommended that John receive a neuropsychological evaluation to provide more information about his disability.

62. The Does engaged Dr. Marcia Hunter, a licensed clinical neuropsychologist with over forty years of experience in the mental health field, to evaluate John.

63. In October 2019, a Portland school psychologist assessed John. Even though Aucocisco had specifically pointed out John's difficulties with orthographic processing, Portland's evaluator opted not to use any instruments that tested for deficits in that area.

64. Portland's school psychologist issued a report dated October 27, 2019. The report recited concerns expressed by John's Breakwater teacher that he was performing "below expectations in listening comprehension, reading . . . and writing"; "require[d] more one-to-one attention than other students"; and "produc[ed] less schoolwork" than his peers.

65. The Portland psychological report diagnosed John with ADHD (inattentive type) and with "processing deficits in short-term working memory,

cognitive efficiency, and number series." Portland's academic testing found that John continued to score below average in reading and written expression.

66. On November 4, 2019, Portland held an IEP Team meeting to review the results of John's evaluation. The Team concluded that John has a specific learning disability and requires special education and related services through the IDEA.

67. The Does filed an IDEA due process complaint in early November 2019, seeking reimbursement of the expenses they had incurred for John's Aucocisco tutorials and compensatory educational services.

68. By the end of 2019, the Does became convinced that, although they appreciated the benefits of John attending Breakwater, that school could not meet his needs given his continuing difficulties with reading and writing.

69. Portland agreed to convene an IEP Team meeting on January 24, 2020, to review its proposed draft IEP for John. Although the Does proposed Aucocisco as John's proper IEP placement, Portland rejected this suggestion.

70. Portland's proposed January 2020 IEP called for John to (a) attend EECS; (b) spend 70% of his time in a regular education environment, for which he lacked the literacy skills to benefit; and (c) receive special education reading instruction that did not specify use of the Seeing Stars program that had proved successful for him or any other specific program.

71. Given the deficiencies in Portland's IEP and placement proposal, the Does rejected the offer and unilaterally enrolled John at Aucocisco as a full-time student beginning in February 2020.

72. In March 2020, Dr. Hunter issued a report of her neuropsychological assessment of John. Her testing found that John's broad reading skills were at the 4th percentile, his basic reading skills were at the 8th percentile, and his reading fluency skills were at the 3rd percentile. John scored in only the 4th percentile on a separate orthographic processing assessment.

73. Recognizing that John's orthographic processing deficit underlay his difficulties with reading and writing, Dr. Hunter recommended specially designed instruction that closely tracked the programming offered at Aucocisco. She advocated the use of "a systematic program that attends to underlying speech-language issues and experiential learning styles (*i.e.*, Seeing Stars and Lindamood-Bell programs)." Dr. Hunter also took issue with Dr. Christie's conclusion that John's lack of engagement stemmed from not being challenged and opined that Portland's December 2017 ineligibility decision did not "pass the straight face test."

74. Dr. Hunter supported John's placement at Aucocisco, finding that Portland's proposed public school program and placement would be insufficient in addressing his phonological, orthographic, and executive functioning deficits.

75. John showed steady progress over the remainder of his fourth-grade year at Aucocisco, even during the period of remote learning required by the COVID-19 pandemic. On testing conducted by Aucocisco on June 29, 2020, John had moved from the first to fifth percentile in word recognition, from the fourth to twenty-first percentile in nonsense word decoding, and from the second to fourth percentile on an his oral reading index, despite the inherent difficulties posed by remote learning.

13

76. Based on his success at Aucocisco, the Does enrolled John in its summer school program for three remote classes per day starting in July 2020.

### Fifth Grade (2020–2021)

77. John continues to attend the Aucocisco School for fifth grade (2020-2021). He has adjusted well to his new school and continues to make progress in developing literacy skills.

### Due Process Hearing

78. A hearing officer appointed by the Maine Department of Education held a hearing on the Does' due process complaint on July 27, 28, 30, and 31, 2020.

79. At the hearing, Dr. Christie testified concerning the December 2017 decision not to find John to be IDEA-eligible: "I do have a bias of let's not disable kids and so when I'm writing a report or when I'm speaking to parents or when I'm speaking to teachers, my bias is let's see if we can give them some supports in the regular education setting that could address this area and see if that helps improve their performance in the achievement areas."

80. The hearing officer expressly found in her decision that "Dr. Christie's stated bias not to identify children as eligible for special education appears to have been implicated in this particular Student's eligibility determination."

81. The hearing officer found that Portland had violated the IDEA's "Child Find" requirement by denying him eligibility. She concluded, therefore, that Portland had denied John a FAPE from December 2017 (the ineligibility decision) through November 2019 (the eligibility decision), and awarded him a compensatory

remedy requiring reimbursement for his Aucocisco tuition and related costs through the first half of the 2020-2021 school year.

82. On the alternative ground for relief asserted by the Does, that the January 2020 IEP and placement offer were inappropriate, the hearing officer ruled against the Does. In doing so, the hearing officer relied on a determination that "the School District was prepared to offer the Student the Seeing Stars program, as well as other programming, in the January 2020 IEP," even though the text of the IEP makes no mention of instruction in "Seeing Stars" specifically or "Lindamood-Bell" programming in general.

## COUNT I
### (Recovery of Attorney's Fees and Expenses: IDEA)

83. Plaintiffs repeat the allegations contained in paragraphs 1-81.

84. The Does were "prevailing parties" in the administrative due process hearing, pursuant to the hearing officer's final order, dated October 13, 2020.

85. Under the IDEA, 20 U.S.C. § 1415(i)(3)(B), and parallel Maine Law, the Does are entitled to an award of reasonable attorney's fees and associated expenses they incurred in connection with prevailing in the administrative proceedings.

86. The Does respectfully request the opportunity to provide the Court with a detailed petition describing the services and amounts for which they seek recovery under section 1415(i)(3)(B).

## COUNT II
### (Intentional Discrimination: Section 504)

87. Plaintiffs repeat the allegations contained in paragraphs 1-86.

88. Portland is a recipient of federal financial assistance, and John qualifies as an "individual with a disability" under Section 504, 29 U.S.C. § 705(20). As an "individual with a disability," John is otherwise qualified to receive educational services from Portland.

89. Section 504 prohibited Portland from intentionally discriminating against John.

90. As outlined above, Portland engaged in intentional discrimination against John by denying him eligibility under the IDEA and denying him needed for services from December 2017 to November 2019. The determination to deny him eligibility for services resulted from disability-based animus, as admitted by Dr. Christie.

91. As a proximate result of this intentional discrimination, John Doe suffered emotional distress and other damage by virtue of the lengthy delay in his receipt of specialized services.

92. The Rehabilitation Act provides remedies to "any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under [Section 504], 29 U.S.C. § 794a(a)(2)."

93. The Does, in their individual capacities, qualify as "person[s] aggrieved" by Portland's violation of Section 504.

94. As a proximate result of the intentional discrimination outlined above, the Does suffered an independent injury in the form of costs incurred to address John's emotional distress by enrolling him at Breakwater and hiring a therapist.

## COUNT III
**(Discrimination: Title II of the ADA)**

95. Plaintiffs repeat the allegations contained in paragraphs 1-94.

96. Portland qualifies as a "public entity" within the ambit of the ADA, 42 U.S.C. § 12131(1)(B), and John is a "qualified individual with a disability" under the ADA by virtue of his learning disability, 42 U.S.C. § 12131(2).

97. The ADA prohibited Portland from discriminating against John based on his disability, 42 U.S.C. § 12132.

98. As outlined above, Portland engaged in intentional discrimination against John by denying him eligibility under the IDEA and denying him needed for services from December 2017 to November 2019. The determination to deny him eligibility for services resulted from disability-based animus, as admitted by Dr. Christie.

99. As a proximate result of this intentional discrimination, John Doe suffered emotional distress and other damage by virtue of the lengthy delay in his receipt of specialized services.

100. The ADA provides rights and remedies to "any person alleging discrimination on the basis of disability in violation of [42 U.S.C. § 12132]," 42 U.S.C. § 12133.

101. The Does, in their individual capacities, qualify as "person[s] alleging discrimination" on the basis of Portland's violation of 42 U.S.C. § 12132.

102. As a proximate result of the intentional discrimination outlined above, the Does suffered an independent injury in the form of costs incurred to address John's emotional distress by enrolling him at Breakwater and hiring a therapist.

## COUNT IV
### (Review of Portion of Due Process Determination: IDEA and 20-A M.R.S.A. § 7207-B)

103. Plaintiffs repeat the allegations contained in paragraphs 1-102.

104. Federal and state special education laws authorize the Court to conduct judicial review of IDEA administrative decisions and "to grant such relief as the court determines is appropriate." This authority includes the power to reverse or vacate erroneous portion of a hearing officer's order.

105. For the reasons outlined above, the hearing officer erred as a matter of law and fact in ruling against the Does on their alternative ground for relief by determining that Portland's January 2020 IEP and placement offer satisfied the District's obligation to provide John with a FAPE.

WHEREFORE, Plaintiffs the Does respectfully request that the Court enter judgment in their favor against Portland Public Schools, and specifically to provide them with the following relief:

a) to award the Does reimbursement of their attorney's fees and costs pursuant to 20 U.S.C. § 1415(i)(3)(B) and *MUSER* § XVI.18;

b) to award the Does compensatory damages that are reasonable in the premises under section 504 and/or Title II of the ADA;

c) to reverse and/or vacate the portion of the hearing officer's order finding that Portland's January 2020 IEP and placement offer provided John with a FAPE;

d) to award the Does reimbursement of their attorney's fees and costs in connection with this action under section 504, the ADA, and/or the IDEA; and

e) to award the Does such further relief as the Court may deem just and proper.

**Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all claims so triable as a matter of right.**

Dated:  December 9, 2020                          Respectfully submitted,

*/s/ Richard L. O'Meara*
Richard L. O'Meara
*E-mail: romeara@mpmlaw.com*

*/s/ Sean R. Turley*
Sean R. Turley
*E-mail: sturley@mpmlaw.com*

Counsel for Plaintiffs

MURRAY, PLUMB & MURRAY
75 Pearl Street, P.O. Box 9785
Portland, ME  04104-5085
(207) 773-5651