## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **MR. AND MS. DOE, individually and as next friends of JOHN DOE, a minor,** | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 2:20-cv-00461-JDL ) |
| **PORTLAND PUBLIC SCHOOLS,** | ) ) ) |
| Defendant. | ) |

### ORDER ON MOTION FOR SUMMARY JUDGMENT

The Plaintiffs, Mr. and Ms. Doe, individually and as the parents and legal guardians of their son John Doe, a minor, allege (ECF No. 1) that Defendant Portland Public Schools ("PPS") unlawfully discriminated against John when it denied him eligibility and special education services under the Individuals with Disabilities Education Act, 20 U.S.C.A. §§ 1400-82 (West 2022) ("IDEA") in 2017, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C.A. §§ 12131-34 (West 2022) ("ADA") and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West 2022) ("Section 504"). The Does also seek recovery of attorneys' fees and costs under the IDEA, 20 U.S.C.A. § 1415(i)(3)(B) (West 2022), and judicial review of a portion of the due process determination under the IDEA, 20 U.S.C.A. § 1415(i)(2), and Maine law, 20-A M.R.S.A. § 7207-B (West 2022). The Does' challenge to the due process determination under the IDEA is addressed in a separate order.

PPS has moved for summary judgment (ECF No. 45) on the Does' discrimination claims, arguing: (1) that the Does' IDEA claim requesting review of the due process determination precludes their ADA and Section 504 discrimination claims as a matter of law, and (2) that even if the discrimination claims are not precluded, no reasonable jury could find that PPS acted with disability-based animus when it denied their son eligibility and special education services in 2017. For the reasons detailed below, I deny PPS' motion for summary judgment.

## I. FACTUAL BACKGROUND

Each party has filed a separate supporting statement of material facts. ECF No. 46 (PPS);[1] ECF No. 48 (Does). The parties also filed a Stipulated Record. ECF No. 44. The factual background below is drawn from these documents.

John was eleven years old at the time the motion for summary judgment was filed. The Does reside in the City of Portland, and John is therefore entitled to educational programming from PPS, which is the local education agency responsible for providing a Free Appropriate Public Education ("FAPE") to students with disabilities residing in Portland. John attended kindergarten through third grade at his neighborhood public school.[2]

---

[1] PPS titled its submission "Statement of Undisputed Material Facts," but the Does' Opposing and Additional Statements of Material Fact indicates that some of PPS' facts are not fully admitted by the Does.

[2] The IDEA defines a FAPE as "special education and related services that – (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized

2

### A.     2017 Special Education Referral

At the beginning of John's second grade school year, Mr. and Ms. Doe contacted their son's school's principal to request that PPS begin a special education referral to consider whether John was eligible for special education services.  After an October 2017 meeting between the Does and the principal, at which the Does provided written consent to begin the evaluation process, PPS assigned Janice Williams to administer an academic evaluation and Dr. Ann Christie to perform a psychological evaluation, which included observing John in the classroom.

The administrative hearing officer who later reviewed the Does' case issued the following findings based on Dr. Christie's 2017 observation of John:

> [John] did not raise his hand, appear[ed] disengaged in the class discussion, and did not follow the instructions for writing that were given, despite Dr. Christie approaching him to prompt him. . . . [T]hroughout most of the observation, [John] sat fiddling with erasers, looking around the room, and talking with peers, rather than completing the assignment; he primarily drew and he wrote only two lines while his peers filled multiple pages with drawings and writing.

ECF No. 48 ¶ 46.

PPS specifically asked Dr. Christie to assess whether John had a reading disability that would qualify him for special education services.  Although she purported to assess John's cognitive development, memory, and phonological processing, Dr. Christie did not assess his literacy skills, nor did she listen to John

---

education program required under [20 U.S.C.A. § 1414(d) (West 2022)]." 20 U.S.C.A. § 1401(9) (West 2022).

read or assess his writing skills. Dr. Christie also did not assess John's orthographic processing capabilities, although she was familiar with the concept and had assessed it in the past for other students.[3] In her evaluation, she concluded that John had relative areas of weakness in phonological processing, but she noted that John had never received phonics intervention and she interpreted the weaknesses, in combination with a lack of prior phonics intervention, to mean that he was not disabled and instead needed phonics intervention.

On December 14, 2017, the Individualized Education Program ("IEP") team met to determine whether John was an eligible student with a specific learning disability.[4] The IEP team was comprised of Dr. Christie, Ms. Williams, Mr. and Ms. Doe, John's classroom teacher, and a PPS representative. The IEP team reviewed the evaluations completed by Dr. Christie and Ms. Williams along with the information provided by the Does and school officials at the meeting. During this IEP team meeting, Dr. Christie provided her opinion that John did not meet the specific learning disability eligibility standards. The team concluded that John did not meet the specific learning disability eligibility standards and was thus ineligible for special

---

[3] "Orthographic processing refers to the skills necessary 'to store and recall the visual forms of letters and words.'" *Falmouth Sch. Dep't v. Mr. Doe*, Docket No. 2:20-cv-00214, 2021 WL 4476939, at *4 n.14 (D. Me. Sept. 29, 2021).

[4] A child with a specific learning disability is entitled to special education services under the IDEA if he requires special education and related services by reason of his disability. 20 U.S.C.A. §§ 1401(3)(A), 1312(a)(1)(A) (West 2022). The specific learning disability standards are defined in regulations promulgated by the U.S. Department of Education. 34 C.F.R. §§ 300.8(c)(10), 300.309(a)(1) (2022).

education services. The Does signed a form indicating that they agreed with this determination.

**B.     2019 Eligibility Determination and 2020 IEP**

In May 2019, the Does asked PPS to re-evaluate John for special education eligibility. In September 2019, before this re-evaluation was completed, the Does unilaterally withdrew John from the Portland Public School System, enrolled him in a local private school, and arranged for him to receive supplemental tutoring services.

PPS proceeded with the new requested special education referral. For this evaluation, Carolyn Foley performed the academic assessment, and Dr. Mary Scammon performed the psychological assessment. On November 4, 2019, the IEP team concluded that John was eligible for special education services because it found that John did have a specific learning disability.

On January 24, 2020, the IEP team met to discuss an IEP for John. At the end of January 2020, the Does enrolled John in a second local private school, where John continues to be enrolled. PPS mailed a proposed IEP to the Does on February 5, 2020.

**C.     Special Education Due Process Hearing**

On November 6, 2019, before the January 2020 IEP team meeting and before the Does received the proposed IEP, the Does filed for a special education due process hearing. The due process hearing was held over four days in July 2020. Dr. Christie testified at the hearing, stating that she believes that "our job as educators is to educate everybody and sometimes what is labeled as a disability is, in fact, a failure

of the system to provide that student with what that student needs in general education." ECF No. 48 ¶ 10.  Dr. Christie further explained that when a school provides special education services to students, "[b]y definition it's disabling them." ECF No. 48 ¶ 42.  She explained her approach in close cases in the following terms: "In the close calls I tend to go no disability and let's see what we can provide in general education . . . . Which is my understanding of the law, we have to provide a response to intervention before we go to specially-designed instruction." ECF No. 48 ¶ 11.  She added: "I do have a bias of let's not disable kids and so when I'm writing a report or when I'm speaking to parents or when I'm speaking to teachers, my bias is let's see if we can give them some supports in the regular education setting that could address this area and see if that helps improve their performance in the achievement area." ECF No. 48 ¶ 11.  She also testified in substance that when there is a clear pattern of strengths and weaknesses relevant to a learning disability, she "most definitely" recommends identifying the student as learning disabled.  ECF No. 48 ¶ 12.

In May 2019, after being asked by PPS to explain why she determined in 2017 that John was not eligible for services, Dr. Christie confirmed to PPS that she did not see support for a dyslexia diagnosis in her 2017 report and that she instead remembered that John was a bright student who was not engaged in the classroom, "perhaps due to not feeling challenged more than an inability to do or difficulty with the work." ECF No. 48 ¶ 44.  Upon cross-examination during the due process hearing, Dr. Christie admitted that her conclusion that John's lack of engagement resulted

from him not being challenged was erroneous and acknowledged that, based on the data from her 2017 evaluations, there was a pattern of strengths and weaknesses in classroom performance and achievement that were associated with a learning disability.

On September 19, 2020, the hearing officer issued a decision agreeing with the Does that PPS erroneously concluded that John was ineligible for special education services in December 2017. Thus, PPS had denied John a FAPE for a period of approximately two years, until PPS offered him an IEP in January 2020 after determining that he was eligible for services in November 2019. The hearing officer found that Dr. Christie's 2019 explanation of her 2017 conclusion was not consistent with the evidence, which indicated that John struggled to keep up with his classmates. Upon review of John's test results from the 2017 evaluation, the hearing officer found that John had a high IQ but "excessively low" basic achievement scores on literacy tasks, with multiple scores below the tenth percentile. ECF No. 48 ¶ 47. The due process hearing officer determined that in 2017 there was "ample evidence upon which [PPS] should have concluded that [John] had specific learning disabilities that required special education" and that PPS' determination that John was ineligible for special education and related services as a student with a specific learning disability was unreasonable and resulted in a denial of his right to a FAPE. ECF No. 48 ¶ 49 (first alteration in original). The hearing officer concluded that "Dr. Christie's stated bias not to identify children as eligible for special education appears to have

been implicated in this particular Student's eligibility determination." ECF No. 48 ¶ 50. To remedy this violation, the hearing officer ordered PPS to reimburse the Does for the costs they had incurred to secure educational services for John during the approximately two-year period during which PPS had denied John a FAPE. The compensatory order also included reimbursement to the Does for a private evaluation that they had obtained for John because Portland failed to assess John's orthographic processing abilities.

## II. LEGAL ANALYSIS

### A. Standard of Review

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Taite v. Bridgewater State Univ., Bd. of Trs.*, 999 F.3d 86, 92-93 (1st Cir. 2021). "An issue is 'genuine' if it can 'be resolved in favor of either party,' and a fact is 'material' if it 'has the potential of affecting the outcome of the case.'" *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016)). To prevail, the moving party must "'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" *Ocasio-Hernandez v. Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (alteration in original) (quoting *Carmona v. Toledo*, 215 F.3d 124, 132

(1st Cir. 2000)).  A court views the evidence in the light most favorable to the non-moving party when determining whether summary judgment should be granted. *Taite*, 999 F.3d at 92.

**B.  Disability Discrimination Claims**

PPS makes two arguments in support of its motion for summary judgment: (1) that the Does' challenge to the due process determination under the IDEA (addressed in a separate order) precludes their ADA and Section 504 discrimination claims as a matter of law, and (2) that even if the discrimination claims are not precluded, no reasonable jury could find that PPS acted with disability-based animus when it determined in 2017 that John was ineligible for special education and related services.  I address each argument in turn.

### 1. The Does' Disability Discrimination Claims Are Not Precluded by Their IDEA Claim

"To state a claim for a violation of Title II [of the ADA], a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits or discrimination was by reason of his disability." *Toledo v. Sanchez*, 454 F.3d 24, 31 (1st Cir. 2006); *see also*; 42 U.S.C.A. § 12132 (West 2022); 29 U.S.C.A. § 794(a) (Section 504 of the Rehabilitation Act).  In this case, only the third element is at issue because PPS determined in November 2019 that John is a student with a learning disability and the due process hearing officer concluded that

9

PPS' conclusion to the contrary in 2017 was erroneous and, thus, John was deprived of a FAPE for a nearly two-year period.[5]

On its face, the IDEA permits plaintiffs to pursue both a claim seeking review of a due process determination and discrimination claims under the ADA and Section 504:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V [(Section 504)] of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C.A. § 1415(l); *see also M.M.R.-z ex rel. Ramirez-Senda v. Puerto Rico*, 528 F.3d 9, 14 (1st Cir. 2008) (quoting the above IDEA subsection and explaining that "[t]hus, on its face IDEA does not preclude claims . . . under the ADA [or] the Rehabilitation Act.").

The First Circuit has confirmed that this savings clause was "intended to ensure that the IDEA does not restrict rights and remedies that were already independently available through other sources of law." *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006). Although plaintiffs may not "disguise an IDEA claim in other garb," they are not "otherwise barred from bringing a non-IDEA claim

---

[5] PPS has not challenged this determination, and focuses its argument in opposition to the Does' discrimination claims entirely on the third element.

alongside an IDEA claim, even if there is *some* overlap between the two claims." *D. B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 39 (1st Cir. 2012). "To prevail on a discrimination claim under the Rehabilitation Act or the ADA involving a denial of a FAPE, a plaintiff must make an additional showing that the denial resulted from a disability-based animus." *Id.* at 40. Thus, a disability-discrimination claim may proceed alongside an IDEA claim "because the discrimination claim involves the additional element of disability-based animus" and, "[a]s such, the discrimination claim does not 'turn entirely on the rights created by statute in the IDEA.'" *Id.* at 40 n.8 (alteration omitted) (quoting *Diaz-Fonseca*, 451 F.3d at 29).

Despite the preceding authority, PPS argues that the Does' claims of discrimination are indistinguishable from their IDEA claim and are, therefore, barred because there is no evidence to support an inference of disability-based animus, as was determined to be the case in *Falmouth School Department v. Mr. Doe*, Docket No. 2:20-cv-00214, 2021 WL 4468904, at *2 (D. Me. Sept. 29, 2021). There, the court dismissed the plaintiffs' counterclaims asserting violations of the ADA and Section 504 because there appeared "to be a complete overlap in the factual allegations" between the discrimination and IDEA claims. *Id*.

*Falmouth* is distinguishable from this case. The only adverse action plausibly pleaded by the *Falmouth* plaintiffs was an unsupported and conclusory allegation of deliberate indifference; otherwise, their discrimination and retaliation claims mirrored their IDEA claim. *Id*. In contrast, the Does have provided record evidence

of Dr. Christie's statement that she had a "bias" against making a finding that a child is disabled in close cases. The record also shows that data from Dr. Christie's evaluation indicated a learning disability but that she nonetheless concluded—consistent with her stated bias—that John was not disabled for purposes of the IDEA.

The Does' discrimination claims turn on whether a factfinder could determine that Dr. Christie's conclusion that John did not have a specific learning disability was rooted in disability-based animus and that this conclusion resulted in the denial of special education and related services to John in 2017. Discriminatory animus is not an element of the IDEA claim. Therefore, the Does' claim that PPS denied John a FAPE on account of his disability could be a valid basis for a claim under the Rehabilitation Act and the ADA, "even if the factual basis for those claims might overlap with that of an IDEA claim." *Lebrón v. Puerto Rico*, 770 F.3d 25, 29-30 (1st Cir. 2014). Because the discrimination claims require proof of an additional element not required by the IDEA claim, PPS is not entitled to summary judgment based on its argument that the claims are indistinguishable.

### 2. There Is a Genuine Dispute of Material Fact as to Whether the Denial of Services Resulted from a Disability-Based Animus

"To prevail on a discrimination claim under the Rehabilitation Act or the ADA involving a denial of a FAPE, a plaintiff must . . . show[] that the denial resulted from a disability-based animus." *Esposito*, 675 F.3d at 40. Thus, the Does must plead and prove that PPS "engaged in some wrongful action because of the child's disability." *Lebrón*, 770 F.3d at 31. The Does contend that Dr. Christie's stated "bias" against

finding eligibility for students with learning disabilities led her to conclude, contrary to the evidence she gathered in her evaluation of John, that he did not have a specific learning disability. Based on the summary judgment record viewed in the light most favorable to the Does as the non-moving party, a reasonable factfinder could find that Dr. Christie's decision that John was not disabled and thus was ineligible for services was rooted in disability-based animus.

The Does bolster their argument that Dr. Christie's decision was rooted in unlawful animus with an expert witness declaration by Dr. Joseph Moldover, submitted in support of their opposition to PPS' motion for summary judgment. Dr. Moldover is a board-certified clinical neuropsychologist who specializes in learning and developmental disorders. Dr. Moldover reviewed the records related to John's 2017 evaluation by PPS and offers his opinion that "there is reason to believe that [PPS'] 2017 determination that John Doe was ineligible for special education services under the IDEA reflected disability-based bias or animus." ECF No. 47-1 ¶ 4. He came to this conclusion based on "the magnitude of the deficits and the score discrepancies evident in the 2017 evaluation, as well as the synchronicity of those findings with the referral questions and concerns presented by John's parents." ECF No 47-1 ¶ 12.

PPS contends that Dr. Moldover's conclusion is not admissible evidence because it provides a legal conclusion that Dr. Christie's findings were motivated by animus, which is the ultimate question of law at issue. Federal Rule of Evidence

13

702(a) permits expert witnesses to provide opinion evidence if that evidence "will help the trier of fact to understand the evidence." Expert testimony "is not objectionable just because [the expert's opinion] embraces an ultimate issue." Fed. R. Evid. 704(a). However, "questions of law are not 'to be decided by the trier of fact,'" and although experts may provide opinions on ultimate factual conclusions, they are not permitted to offer an opinion on an ultimate legal conclusion. *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 100 (1st Cir. 1997). A "district court has broad discretion to exclude expert opinion evidence about the law that would impinge on the roles of the judge and the jury." *Pelletier v. Main St. Textiles, LP*, 470 F.3d 48, 54 (1st Cir. 2006).

In addition to stating his opinion that Dr. Christie's findings were motivated by disability-based animus, Dr. Moldover's declaration sets forth his evaluation of the facts at the heart of this dispute; namely, the 2017 data that was available to the 2017 IEP team regarding John's literacy skills. His criticism of Dr. Christie's findings and his opinion that Dr. Christie's conclusions were not supported by the data represent opinions related to questions of fact and may properly be considered for that purpose. However, I do not consider his ultimate conclusion that "there is reason to believe that [PPS'] 2017 determination that John Doe was ineligible for special education services under the IDEA reflected disability-based bias or animus," ECF No. 47-1 ¶ 4, because it speaks to the ultimate question of law in this case.

Dr. Christie described her "bias" against labeling children as disabled when they presented as a "close call" as a preference for prioritizing classroom-based

14

interventions in keeping with IDEA's least restrictive environment requirement. As PPS notes, the IDEA states a preference for children to receive educational supports in a regular classroom setting before labeling them as disabled. *See* 20 U.S.C.A. § 1400(c)(5) (West 2022) ("Almost 30 years of research and experience has demonstrated that the education of children with disabilities can be made more effective by . . . providing incentives for whole-school approaches, scientifically based early reading programs, positive behavioral interventions and supports, and early intervening services to reduce the need to label children as disabled in order to address the learning and behavioral needs of such children."). The IDEA mandates that, "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C.A. § 1412 (a)(5)(A) (West 2022).

PPS contends that the Does make too much of Dr. Christie's use of the word "bias" and that her testimony must be understood in the context of her preference for providing interventions in the classroom for students who may need only those lesser supports; implicitly, PPS asks the Court to assume that John was such a student.

The hearing officer's findings, however, indicate that the determination of whether John had a specific learning disability that qualified him for special

education services under the IDEA was not a close call. Dr. Christie's data from the 2017 evaluation indicated that there was a substantial discrepancy between John's IQ and his performance on literacy tests, and Dr. Christie later acknowledged at the due process hearing that the 2017 evaluation revealed "a pattern of strengths and weaknesses in both classroom performance and achievement relevant to a learning disability." ECF No. 48 ¶ 48. The hearing officer determined that Dr. Christie ignored "ample evidence upon which [PPS] should have concluded that [John] had specific learning disabilities that required special education." ECF No. 48 ¶ 49 (first alteration in original).

Dr. Christie's acknowledgement and the hearing officer's determination align with Dr. Moldover's analysis of the 2017 evaluation. Dr. Moldover opined that the discrepancy between John's high IQ score and his low scores on several academic achievement metrics was strongly indicative of a learning disability and that such a discrepancy "occurs in less than 1% of the general population." ECF No. 47-1 ¶ 8. Dr. Moldover also explained that "John's performance f[e]ll at least one standard deviation below the mean for age on six literacy-related subtests" and that "his performance was dramatically below the level that would be expected given his high intellectual capability." ECF No. 47-1 ¶ 10. Thus, PPS' assertion that Dr. Christie's stated "bias" labeling children as disabled in close cases was appropriate and in keeping with the purpose of the IDEA does not resolve the question of why Dr. Christie concluded that John was not disabled after she evaluated him in 2017. A

"bias" in close cases arguably aligns with the IDEA's purpose, but the record does not demonstrate that John's diagnosis was a close call—thus, a reasonable jury could conclude that Dr. Christie's stated "bias" was rooted in animus.  Additionally, the hearing officer determined that Dr. Christie's explanation for her findings was unsupported by the record and that her "stated bias not to identify children as eligible for special education appears to have been implicated in this particular Student's eligibility determination."  ECF 48 ¶ 50.

A reasonable factfinder could deduce from the foregoing facts that Dr. Christie's stated "bias" represented disability-based animus that motivated her determination that John was not a student with a specific learning disability, and that her opinion led to PPS' decision that John was not eligible for special education and related services.  That a reasonable factfinder could also reach the opposite conclusion points to genuine disputes of material fact on this issue.  Although PPS also contends that a causal link between Dr. Christie's approach and the determination that John was not eligible is not shown because Dr. Christie was not empowered to unilaterally decide John's eligibility, a factfinder could find that her recommendation greatly influenced the 2017 IEP team's decision because Dr. Christie was the sole expert tasked with conducting the psychological evaluation and assessing John's literacy skills.

### III.  CONCLUSION

There is a genuine dispute of material fact as to whether the IEP team's 2017 conclusion that John did not have a specific learning disability was motivated by unlawful discriminatory animus.  Accordingly, PPS is not entitled to summary judgment.

It is **ORDERED** that Portland Public School's Motion for Summary Judgment (ECF No. 45) is **DENIED**.

**SO ORDERED.**

Dated: July 14, 2022.

                                                                **/s/ JON D. LEVY**
                                        **CHIEF U.S. DISTRICT JUDGE**