## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| MR. AND MS. DOE, individually and as next friends of JOHN DOE, a minor,<br><br>    Plaintiffs,<br><br>        v.<br><br>PORTLAND PUBLIC SCHOOLS,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  **2:20-cv-00461-JDL**<br>)<br>)<br>)<br>) |

## ORDER ON PLAINTIFFS' APPEAL OF THE ADMINISTRATIVE HEARING OFFICER'S DECISION

The Plaintiffs, Mr. and Ms. Doe, individually and as parents and legal guardians of their son John Doe, a minor, filed a complaint (ECF No. 1) against Defendant Portland Public Schools ("PPS"). The Does contend that a Maine Department of Education hearing officer erred in determining that the Individualized Education Program ("IEP") proposed by PPS during John's fourth-grade year satisfied PPS' obligation to provide him with a Free Appropriate Public Education ("FAPE"), as required by federal and Maine law.[1] They seek judicial review (ECF No. 23) of the hearing officer's determination under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C.A. § 1415(i)(2) (West 2022), and corresponding

---

[1] The IDEA defines a FAPE to as "special education and related services that – (A) have been provided at public expense, under public supervision and direction, and without charge; (B) meet the standards of the State educational agency; (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and (D) are provided in conformity with the individualized education program required under [20 U.S.C.A. § 1414(d) (West 2022)]." 20 U.S.C.A. § 1401(9) (West 2022).

Maine state law, 20-A M.R.S.A. § 7207-B(2)(B) (West 2022).[2]  The Does also seek recovery of attorneys' fees and costs incurred in connection with the due process hearing proceedings, pursuant to 20 U.S.C.A. § 1415(i)(3)(B).  For the following reasons, I affirm the hearing officer's determination.

## I.  FACTUAL BACKGROUND

The facts are drawn from the sealed administrative record (ECF No. 22).  The Administrative Record also includes the transcript of the July 2020 due process hearing as volumes X-XIII.  I cite to these volumes using the page numbers in the transcript ("Tr.").

### A.    John Doe's Educational Background

John is now twelve years old and resides with his parents in the Portland School District.  From kindergarten through third grade, he attended the East End Community School in the City of Portland.  John struggled with literacy skills throughout these years, and his parents observed that he was uncomfortable reading and made little progress with his literacy development.  John also experienced bullying and peer issues during this time and began to refer to himself as "stupid."

The Does raised concerns about John's academic challenges and, at the start of John's second-grade year in 2017, asked PPS to conduct an evaluation to determine whether he had a specific learning disability that would make him eligible for special

---

[2]  The Does also allege that PPS discriminated against John in violation of the Americans with Disabilities Act, 42 U.S.C.A. §§ 12131-34 (West 2022), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C.A. § 794 (West 2022), when it denied him special education services in 2017.  The IDEA and discrimination claims have been bifurcated (ECF Nos. 13, 14) and are being addressed on separate tracks.

education services.  PPS' school psychologist, Dr. Ann Christie, evaluated John and determined that, although his IQ score was above average and his overall cognitive-function abilities ranged from average to above average, his phonological-processing and visual-memory abilities were below average such that educational interventions would be helpful.  Following this evaluation, the IEP team determined that John did not have a specific learning disability and thus was not eligible for special education services.  As I will later explain, in 2020, following a due process hearing, a hearing officer found this decision to be erroneous and a denial of John's right to a FAPE.

In April 2019, the Does arranged for John's reading skills to be independently evaluated by the Aucocisco School and Learning Center in Cape Elizabeth.[3]  John's performance on this evaluation indicated that he had learning strengths and weaknesses consistent with dyslexia and that he struggled with both phonological and orthographic processing.[4]  The evaluator recommended use of the Seeing Stars program for John because of its joint focus on orthographic- and phonological-processing development.  In response, the Does wrote to PPS to request that John be referred again for IEP eligibility and informed PPS that they would unilaterally act in the interim period to address the learning losses they believed John had endured.

---

[3]  Aucocisco School is a non-profit, special-purpose private school with a mission to serve students with special needs.

[4]  Orthographic processing is "the underlying skill needed to store and recall the visual forms of letters and words," A.R. 1010, and phonological processing is "the ability to perceive and order sounds within words," A.R. 1009.

In May 2019, John began attending one-on-one Seeing Stars tutorials at Aucocisco for several hours per day, and his attitude regarding reading and his overall mood improved. For John's fourth-grade year, the Does unilaterally enrolled him at a different private school to enable him to have smaller classes and more individualized attention and supplemented his classroom work with Seeing Stars tutoring.

John's classroom teacher at the private school met with the Does in September 2019 to report that John had difficulty focusing in the classroom and continued to struggle with literacy skills. John's tutor reported that John would need more time with the Seeing Stars program to make gains in his literacy work. The private school recommended that the Does obtain a neuropsychological evaluation to better understand the processing deficits contributing to John's academic struggles. The Does arranged for Dr. Marcia Hunter, who was recommended by the private school, to evaluate John. During this period, PPS also had John re-evaluated. PPS ultimately determined in November 2019 that John had a learning disability and was eligible for specialized instruction under the IDEA.

**B.    PPS' 2020 IEP Offer**

By November 2019, the Does determined that John's private school placement with extra tutorials was not sufficient and that John needed additional intensive literacy instruction. They agreed to hold an IEP team meeting to receive PPS' offer of an IEP and placement, and PPS held an IEP team meeting on January 24, 2020. This meeting was memorialized in a Written Prior Notice prepared by PPS and

provided to the Does.  The Written Prior Notice (or, alternatively, prior written notice) is a required notification that the local education agency charged with providing a FAPE to a child must provide to that child's parents whenever the agency either proposes or refuses to initiate or change the "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child."  20 U.S.C.A. § 1415(b)(3).  PPS designated Sherri Beall, an educational consultant, to develop and implement John's literacy program, which would be delivered by PPS educators in consultation with Beall.  PPS contracted with Beall to oversee implementation of the program that she designed for John's IEP, train staff as needed, monitor John's progress, and directly observe John in the classroom throughout the year.

During the IEP team meeting, PPS discussed staff at various Portland elementary schools who could provide literacy instruction, including at the Presumpscot and Lyseth Elementary Schools, where the special educators were trained in dyslexia and specialized literacy instruction methods, including the Seeing Stars program, the Orton Gillinham approach, and the Lindamood Phoneme Sequencing program ("LiPS").  The Does rejected these options.  Ultimately, the IEP designated John's placement as the East End Community School.  Beall explained to the IEP team that she believed that the approach to John's instruction was more important than the use of a specific program, and the Written Prior Notice memorialized that Beall "advocated for [John]'s instruction to include concrete visual

5

representation, orthographic and auditory processing focus, and progression from concrete to abstract concepts." A.R. 486.

PPS' proposed program—documented both in the Written Prior Notice and in the ultimate IEP—included 225 minutes per week each of one-on-one reading and writing services (for a total of 450 minutes per week), one hour per day of math support in a general education classroom, 30 minutes per day of one-on-one math fluency work, 30 minutes per week of social work counseling, and 70 hours per year of special education consultation. John would be in a general education setting for the remaining 70% of his school day. While in the general education setting, though, John would receive additional accommodations including: having assignments read to him to ensure that he understood directions; receiving preferential seating to reduce distractions; receiving extra time to complete tasks; being placed in small group settings; receiving accessible education materials, including digital text and speech to text; and having access to a human reader when not having his own reading assessed. The programming proposed in the IEP targeted John's orthographic-processing deficits, providing that, "given specially designed instruction, [John] will build his orthographic processing of sight words by using symbol imagery techniques." A.R. 494. The IEP also proposed programming to address John's phonological-processing deficits, with objectives including: "given specially designed instruction and accommodations, [John] will build phonological awareness as demonstrated by increased fluency rates given timed practice in segmenting,

6

blending and auditory analysis of sounds within a syllable as measured by formal, informal and curriculum based assessments."  A.R. 493.

The Does rejected PPS' IEP and placement offer during the January 2020 meeting, although they expressed agreement with the goals and needs presented in the IEP.  The Does expressed that they did not "feel that the plan [was] going to be met," A.R. 489, and did not want John to spend 70% of his time in a general education classroom because he had struggled previously in a general education setting.  In January 2020, the Does unilaterally enrolled John at Aucocisco.

## C.     The July 2020 Due Process Hearing

The Does filed a due process complaint in November 2019.  A four-day hearing was held from July 27 through July 31, 2020.  Four issues were addressed at the hearing, and the Does now seek judicial review of the hearing officer's decisions as to one of those issues: whether PPS' January 2020 IEP and placement offer failed to provide John with a FAPE.

Beall, the educational consultant, testified at the hearing about her assessment of John and the reading program she developed for the IEP.  Beall testified that her assessment led her to conclude that John had a learning disability in reading and needed extra educational programming to address his foundational reading skills.  She explained that the IEP did not specify a named methodology for reading instruction because she prefers to utilize components of multiple programs to meet a child's specific needs rather than "pigeonhol[ing]" them "into one program." Tr. 808:11-12.  She clarified that "if I limited myself just to Seeing Stars, . . . I may

be doing the student a disservice actually.  [Seeing Stars is] very valuable, . . . but really when you get fluent with programing I think individualizing that symbol imagery works to [fit][5] the learner's needs."  Tr. 809:3-11.

On cross-examination, Beall was questioned about statements she had made in a 2017 administrative hearing that involved a different student.  At the 2017 hearing, Beall stated that she did not see value in the Seeing Stars program and had not previously administered that program.  On redirect during the July 2020 hearing for John's case, Beall explained that she had been nervous during that earlier testimony, and that she understands and appreciates the value of the tools and strategies used in the Seeing Stars program, had used them in the past, and intended to use them for John along with other components of a reading program.  Specifically, Beall testified that she had used the Seeing Stars program, in full or in part, with each of the 15 to 25 reading students she had worked with the prior year.

Dr. Hunter, the educational expert retained by the Does to evaluate John, testified that, based on her findings after examining John, it was her opinion that John would benefit from more one-on-one instruction than the IEP provided.  It was Dr. Hunter's opinion that a placement at Aucocisco would be beneficial for John.

---

[5]   The transcript reflects that Beall said "hit;" however, this appears from context to be a typographical error.

**D.     The October 2020 Administrative Decision**

In a decision dated October 13, 2020,[6] the hearing officer ruled: (1) that PPS violated its child-find obligations beginning in December 2017 and its determination that John was not eligible for special education and related services was unreasonable and resulted in a denial of John's right to a FAPE until an IEP was offered to him in January 2020; (2) that PPS' program and placement offer in its January 2020 IEP was reasonably calculated to enable John to make appropriate progress in light of his circumstances while allowing him to access a general education with his peers to the maximum extent appropriate, consistent with the FAPE standard clarified by the Supreme Court in *Endrew F. ex rel. Joseph F. v. Douglas County School District RE-1*, 137 S. Ct. 988 (2017); and (3) that PPS was required to reimburse the Does for the costs they incurred for educational services to redress the denial of a FAPE from December 2017 through November 2019.  The Does specifically challenge the hearing officer's second determination before this Court.

The hearing officer determined that the IEP team considered placement for John "at East End Community School, Lyseth Elementary School, Presumpscot Elementary School, and any other elementary school in the Portland Public School system.  All options within the School District were rejected by the Does.  School District staff rejected Aucocisco School due to the lack of access to rigorous grade level curriculum and typical peers." A.R. 39 (citations omitted).  Further, she found that

---

[6]  The hearing officer's original decision was issued on September 19, 2020, and was subsequently amended to clarify the amount of reimbursement ordered for Dr. Hunter's evaluation obtained by the Does.

"while the School District offered placement for the Student at any elementary school within the School District, the School District suggested Lyseth Elementary School because its special educators had additional training in dyslexia and in the Orton Gillingham reading program or Presumpscot Elementary School because it had two special educators trained in LiPS and Seeing Stars." A.R. 68. She concluded that although Dr. Hunter testified that John needed more one-on-one daily instruction than the IEP provided, the amount provided in the IEP would have provided a reasonable amount of support for John. She also noted that the IEP provided significant accommodations—including specialized instructional strategies; regular assessments, testing, and grading in small group settings; additional materials; and an hour of adult support during mathematics classroom instruction each day—during the 70% of time that John would have spent in the general education setting. She recognized that although Aucocisco might provide John with an excellent individualized program, the IEP proposed by PPS was a highly individualized program and placement which offered a FAPE.

## II.  LEGAL ANALYSIS

### A.    Standard of Review

Decisions of a due process hearing officer are reviewable in federal district court. 20 U.S.C.A. § 1415(i)(2)(A). The district court's review of the hearing officer's decision constitutes "a more critical appraisal than clear-error review" but "falls well short of complete *de novo* review." *Doe v. Cape Elizabeth Sch. Dist.*, 832 F.3d 69, 82 (1st Cir. 2016) (alteration omitted) (quoting *Lenn v. Portland Sch. Comm.*, 998 F.2d

1083, 1086 (1st Cir. 1993)).  The district court must review the administrative record, and any supplemental evidence provided by the parties, and make "an independent ruling based on the preponderance of the evidence." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 35-36 (1st Cir. 2012) (quoting *Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.*, 361 F.3d 80, 83 (1st Cir. 2004)); *accord* 20 U.S.C.A. § 1415(i)(2)(C).  However, the district court must "give due deference to the findings of the administrative hearing officer." *Sebastian M. v. King Philip Reg'l Sch. Dist.*, 685 F.3d 79, 85 (1st Cir. 2012).  "Although the exact quantum of weight is subject to the district judge's exercise of informed discretion, the judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." *Lenn*, 998 F.2d at 1087 (citations omitted).  "[T]he district court should afford varying degrees of deference to the [due process] hearing officer depending on the persuasiveness of the administrative finding" while making "an independent judgment on the relevance (or credibility) of the measures in dispute." *Cape Elizabeth Sch. Dist.*, 832 F.3d at 83.  Ultimately, "the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." *Id.* at 84 (quoting *Lenn*, 998 F.2d at 1087).

The party seeking relief in an IDEA case bears the burden of persuasion.  *See Hampton Sch. Dist. v. Dobrolowski*, 976 F.2d 48, 54 (1st Cir. 1992) ("The burden of proof at trial was on the school district as the party challenging the hearing officer's decision.").

**B.     IEP Requirements**

"The 'primary vehicle' for delivery of a FAPE is an IEP." *Sebastian M.*, 685 F.3d at 84 (quoting *Lessard v. Wilton Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008)).  An IEP must be both procedurally and substantively appropriate to provide a FAPE, so a reviewing court must ask, "[f]irst, has the State complied with the procedures set forth in the [IDEA]?  And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982).  The Does have not challenged the procedural appropriateness of the IEP; thus, I do not address that issue further and assume, for purposes of this order, that it is.

The inquiry as to whether an IEP is substantively appropriate—whether it is "reasonably calculated to enable the child to receive educational benefits"—is an individualized assessment to be conducted in light of the unique circumstances of the child for whom it was created.  *Endrew F.*, 137 S. Ct. at 996, 1000-01 (quoting *Rowley*, 458 U.S. at 207).  Although, "[f]or children receiving instruction in the regular classroom, this would generally require an IEP 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade,'" *id*. at 996 (quoting *Rowley*, 458 U.S. at 204), grade-level advancement is not always the correct measure of substantive appropriateness, *Id.* at 1001.  Instead, the Supreme Court has emphasized the individualized assessment required to determine the appropriateness of an IEP, explaining that "the progress contemplated by the IEP

must be appropriate in light of the child's circumstances." *Id.* at 999.  Finally, "[a]n

IEP need not . . . offer the student 'an optimal or an ideal level of educational benefit'"

to be substantively appropriate.  *Johnson v. Bos. Pub. Sch.*, 906 F.3d 182, 185-86 (1st

Cir. 2018) (quoting *Lessard*, 518 F.3d at 23-24).

The IDEA also requires that an IEP provide placement in the least restrictive

environment.  20 U.S.C.A. § 1412(a)(5) (West 2022).  The First Circuit has noted that

the least restrictive environment and FAPE requirements "'operate in tandem to

create a continuum' of possible educational environments, each offering a different

mix of benefits (and costs) for a student's academic, as well as social and emotional,

progress." *C.D. ex rel. M.D. v. Natick Pub. Sch. Dist.*, 924 F.3d 621, 631 (1st Cir. 2019)

(quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 993 (1st Cir. 1990)).

Satisfying both the FAPE and least restrictive environment requirements requires a

school district to "choos[e] a placement that strikes an appropriate balance between

the restrictiveness of the placement and educational progress." *Id.*

## C. Whether the Hearing Officer Erred in Determining That the January 2020 IEP Provided John with a FAPE

The hearing officer determined that PPS' January 2020 IEP and placement

offer provided John with a FAPE; the Does argue that this conclusion was erroneous.

The parties do not dispute that the IEP properly stated John's then-present levels of

academic achievement and functional performance and that it appropriately

described how his disability affects his involvement and progress in the general

education curriculum.  The Does make two contentions in support of their argument:

first, that the IEP did not provide the supports and placements necessary to allow John to reach a level of literacy skills at or near grade level; and, second, that the IEP did not provide a FAPE because it did not specify that PPS offered the Seeing Stars program (or an equivalent program) to address John's orthographic processing deficits and that the hearing officer incorrectly concluded that PPS offered this specific programming by considering extrinsic evidence outside the four corners of the IEP.

## 1.    The Goals Set for John's Progress in the IEP Were Appropriate in Light of John's Circumstances

As both PPS and the Does acknowledge, John has at least average-range cognitive abilities, but his educational progress has been hindered by his dyslexia. The Does also assert that, because John has at least average-range cognitive abilities, his IEP should have set a progress goal of grade-level advancement for his literacy skills.  PPS counters that the Supreme Court was clear in *Endrew F.* that there is no bright-line test for appropriateness and that, instead, progress goals must be "appropriate in light of the child's circumstances."  *Endrew F.*, 137 S. Ct. at 999.

PPS articulates the correct legal standard; the IEP did not need to call for grade-level advancement to be substantively appropriate.  Moreover, for the reasons that follow, I conclude that the IEP and placement that PPS offered to John in January 2020 were reasonably calculated to enable John to make appropriate progress in light of his specific circumstances.

2.    **The Programming Offered in the IEP Was Reasonably Calculated to Enable John to Make Progress Appropriate in Light of His Circumstances**

The Does argue that the IEP proposed by PPS was deficient because it did not provide a sufficient amount of one-on-one instruction and support and failed to commit to providing the Seeing Stars program or equivalent instruction.  In addition, the Does contend that the IEP's proposal to place John at the East End Community School in a general classroom for 70% of the time would leave him unsupported in a classroom environment where he had previously struggled.  PPS argues that the IEP struck the appropriate balance between providing John with supports tailored to meet his individual needs and ensuring that John receives these supports in the least restrictive environment, through the provision of orthographic and phonological instruction as well as one-on-one instruction and additional support within the general classroom.  PPS contends that John's cognitive abilities militate in favor of the IEP's provision that he spend 70% of his day in a general classroom.

Although the Does contend that John required more one-on-one instruction than the IEP offered, asserting that for the 70% of time that John would spend in the general classroom, "Portland included only an accommodation that John would receive some undefined 'adult support in mathematics' for one hour per day."  ECF No. 23 at 30 n.8.  Contrary to this argument, the proposed IEP program included multiple forms of assistance within the general classroom, including the provision of small-group environments for assessment, testing, and grading; materials to support John's access to the curriculum; and specialized instructional strategies, as well as

15

weekly social work services and special education consultation throughout the year. This was in addition to the one-on-one instruction specifically tailored to address John's literacy deficits, which was comprised of 450 minutes per week of reading and writing services (divided evenly into 225 minutes per week of reading services and 225 minutes per week of writing services), as well as additional math support in both one-on-one and supported-classroom environments.  Thus, although the IEP provided that John would spend 70% of his day in a general education setting, PPS offered to provide substantial additional accommodations in that setting tailored to John's needs and cognitive abilities.

The Does also contend that they should prevail because "[PPS'] special education director admitted . . . that the January 2020 IEP offer makes no commitment toward instructing John using the Seeing Stars program, or any equivalent program designed to address and remediate John's orthographic processing deficit."  ECF No. 23 at 29.  This assertion is not supported in the record. The portion of the hearing transcript cited by the Does indicates that PPS' special education director was asked whether the IEP document informed the Does of any particular reading program John would receive if the IEP was accepted.  The special education director responded:  "We did not."  Tr. 502:2.  He then testified that "we didn't say specifically in the IEP meeting that we would be using Seeing Stars. . . . [W]e talked about a number of programs that we could be using and Seeing Stars was definitely one of those."  Tr. 502:9-13.  Thus, although the special education director acknowledged that Seeing Stars was not specifically listed in the IEP, he did not state

that the IEP made no commitment to use Seeing Stars or any other equivalent program to address and remediate John's orthographic processing deficit. Similarly, the Does' related argument that "[n]othing in [PPS'] IEP ensured that John would receive . . . the specialized programming appropriate to address his unique needs as a student with orthographic dyslexia" is not supported by the IEP itself. ECF No. 23 at 34-35. The IEP explicitly provides that, "given specially designed instruction, [John] will build his orthographic processing of sight words by using symbol imagery techniques." A.R. 494.

The IDEA did not require PPS to offer the specific program—Seeing Stars—preferred by the Does. Instead, the IDEA required that the IEP set out a program that would address John's orthographic- and phonological-processing deficits, which it did. As previously noted, the IEP provided that John "will build his orthographic processing of sight words by using symbol imagery techniques." A.R. 494. The IEP was also explicit regarding reading fluency, providing that John would receive "specially designed instruction and accommodations [which] will increase his reading fluency from 1.5 to 3, as documented by the assessment descriptor, at his independent reading level with 95% accuracy." A.R. 494 (footnote omitted).[7] And in keeping the with the IDEA's requirements, PPS was also required to abide by the least-restrictive-environment requirement. Thus, the IEP's provision that John would

---

[7] As explained in the IEP, a reading fluency score of 1.5 means that the student "reads primarily in short phrases with some appropriate pausing for meaning and punctuation, but with a slower rate of speed than expected," while a reading fluency score of 3 demonstrates that the student "[r]eads primarily in larger, meaningful phrases or word groups; mostly smooth, expressive interpretation and pausing guided by author's meaning and punctuation; appropriate stress and rate with only a few slow downs." A.R. 494.

spend 70% of his day in a general education setting, while receiving accommodations, is consistent with the IDEA's requirements.

For the preceding reasons, the hearing officer properly concluded that "the IEP . . . was reasonably calculated to enable [John] to make progress appropriate in light of his circumstances while allowing his education with peers to the maximum extent appropriate, consistent with the Supreme Court's clarification of the FAPE standard in *Endrew F.*"  A.R. 69.

### 3.   The Hearing Officer Improperly Relied on Information Outside the Proposed Written IEP

The hearing officer found that, although the IEP did not identify the Seeing Stars program as instruction that would be provided to John, PPS was prepared to offer the Seeing Stars program or similar orthographic-processing instruction because PPS offered placement to John at any school in the district, and specifically suggested two schools with educators trained in dyslexia and orthographic-processing instruction, including Seeing Stars.  The Does contend that the hearing officer improperly relied on information outside of the written IEP to reach this conclusion— specifically, the Written Prior Notice that memorialized the January 2020 IEP team meeting.  PPS asserts that the IDEA does not limit consideration of a district's proposals to the four corners of the written IEP and argues that the IDEA does not require the IEP to name specific methodologies that it would provide to John.  The issue in the case at hand is not, as the Does frame it, whether the IEP failed to provide John with a FAPE because it did not include a commitment to providing the Seeing

Stars program or an equivalent methodology.  Instead, the issue is whether the IEP provided a FAPE by offering programming specially designed to address John's individual needs.  The specific need at issue is John's orthographic-processing deficit. Although the Does contend that John required a program "based on Seeing Stars (or a proven equivalent)," ECF No. 23 at 29, this level of specificity is not required by the IDEA.  For the following reasons, I conclude that the hearing officer's decision that the IEP provided John with a FAPE was correct, although I also conclude that it was unnecessary for the hearing officer to look to information outside of the IEP to reach that determination.  Thus, I affirm the hearing officer's ultimate conclusion that the IEP provided John with a FAPE.

The hearing officer observed that the Does were critical of PPS' designation of Beall to consult on John's literacy program because she had expressed criticism of the Seeing Stars program during a separate due process hearing in 2017.  The hearing officer noted this concern but credited Beall's hearing testimony that she had used the program in full or in part with all of the reading students she worked with the prior year.  The hearing officer also determined that PPS presented the Does with the option of a placement for John at any elementary school within the district.  This was significant because PPS had informed the Does, during the IEP team meeting and in the Written Prior Notice, that special education teachers employed at Lyseth Elementary School had training in dyslexia and in the Orton Gillingham reading program and that special education teachers employed at Presumpscot Elementary School had trained in LiPS and Seeing Stars.  The hearing officer concluded that this

offer also demonstrated PPS' intention to address the orthographic-processing deficit at the root of John's learning disability in keeping with the IEP.

The Does argue that the hearing officer erred by looking beyond the IEP itself and basing the preceding findings on evidence consisting of records of what the IEP team discussed during the January 2020 meeting.  They contend that the hearing officer's consideration of this evidence was improper, arguing that an IEP should only be evaluated for substantive appropriateness based on the language in the document itself.  The Does characterize this limitation as clearly established by First Circuit precedent, relying on *Ms. M. v. Falmouth School Department*, 847 F.3d 19, 27-29 (1st Cir. 2017).

In *Ms. M.*, the First Circuit held that a school did not violate a student's IEP or the IDEA by failing to provide a specific program of reading instruction listed in a Written Prior Notice but not specified in the IEP itself, reversing the district court's conclusion that the IEP could be read to contain that specific program because it was listed in the Written Prior Notice.  *Id.*  The district court had looked to extrinsic evidence—the Written Prior Notice—to interpret the IEP because it determined that this evidence was necessary to resolve ambiguity in the phrase "Specially Designed Instruction" included in the IEP.  *Id.* at 27.  In assessing whether it was proper for the district court to rely on the Written Prior Notice, the First Circuit noted that, "[t]hough the 'statement' in [the student's] particular IEP, which indicated that she would receive 'Specially Designed Instruction' in reading and math, appears vague in the abstract, its precise meaning is made clear when viewed alongside

complementary sections of the IDEA, Maine-specific rules and regulations carrying out the state's IDEA obligations, and other sources of regulatory guidance." *Id*. Thus, the First Circuit concluded that it was not necessary to consider the Written Prior Notice to interpret the IEP, and the school was not required to offer the specific reading program listed in the Written Prior Notice. The First Circuit also explained that "the IDEA does not require schools to include specific instructional methods in an IEP." *Id*. at 27 (citing 20 U.S.C.A. § 1414(d)(1)(A)(ii)(I) (West 2022)). Instead, an IEP represents "an agreed-to general framework of a child's educational program that provides schools with a certain degree of flexibility in accomplishing the outlined objectives." *Id*. at 28.

As discussed above, whether PPS had offered a FAPE to John depends on whether the IEP sufficiently addressed John's learning deficits including his orthographic processing disorder. Thus, it was unnecessary for the hearing officer to look to extrinsic information because PPS' commitment on this issue was contained within the IEP's four corners. Under *Ms. M.*, the Does would not have been able to challenge a failure of PPS to provide the Seeing Stars program to John had they accepted the IEP. However, this would not have left them without a remedy. The IEP committed to providing John with "specially designed instruction" to address John's "orthographic processing of sight words using symbol imagery techniques." A.R. 494. If PPS had failed to provide John with specially designed instruction to support his orthographic processing deficits, then the Does would have been able to challenge this as a violation of the IEP and thus, also, of the IDEA. For these reasons,

the IEP satisfied the requirements of the IDEA even though it did not specify the methodology to be offered because, as previously observed, "the IDEA does not require schools to include specific instructional methods in an IEP." *Ms. M.*, 847 F.3d at 27.

The Does also point to three recent due process administrative decisions, which were reviewed and considered by the hearing officer in this case, to support their argument that PPS' IEP was not substantively appropriate because it purportedly lacked targeted remediation for John's orthographic processing deficit. The Does argue that the factual similarities of those cases to this case should compel the Court to adopt the same reasoning and results here. PPS responds that these cases should be afforded no weight because they are not precedential and are distinguishable from John's individual circumstances, thus offering little guidance here. PPS has the stronger argument.

First, in *Parents v. Falmouth School Department*, No. 17.052H (Me. Dep't of Educ. Oct. 31, 2017), the parents challenged the school's decision to lower the IEP's progress expectations for their child rather than exploring why he was not making progress and investigating and providing programming to address his orthographic processing deficits. The hearing officer determined that the school did not provide the student with a FAPE because of these failures. Second, in *Parents v. RSU No. 75*, No. 18.047H (Me. Dep't of Educ. June 22, 2018), the hearing officer determined that the IEP team's failure to consider how to address the student's orthographic processing disorder, which had been flagged as a crucial issue impacting his education, rendered his IEP inappropriate. Finally, in *Parents v. Falmouth*, No.

20.053H (Me. Dep't of Educ. Apr. 11, 2020), the hearing officer determined that a school's IEP that proposed ending the Seeing Stars program for a child with orthographic challenges and returning him to a program that was not delivering results, and the IEP team's failure to consider other methodologies to address the student's orthographic processing deficits, rendered the IEP inadequate as it failed to specially design a program to meet the student's unique needs.

These three administrative decisions are distinguishable from John's case in a crucial way—in each instance the school was faulted for failing to offer programming to address identified orthographic processing deficits.   Here, PPS proposed programming in the IEP designed to address John's orthographic processing deficits. The Does contend that PPS should have explicitly stated in the IEP that it would provide instruction in the Seeing Stars program.   But, as previously explained, an explicit reference to a specific instructional method such as the Seeing Stars program is not required, and the IEP stated that John would receive "specially designed instruction" to "build his orthographic processing of sight words." A.R. 494.   Thus, the IEP here differs from the IEPs considered in the three administrative decisions cited by the Does because it demonstrates that John's orthographic processing deficits were considered and, in response, specialized programming to address those  deficits was offered.

## III.  CONCLUSION

It is understandable that the Does were and remain skeptical of PPS' commitment to provide John with the educational support he needs, given PPS'

failure to do so from 2017 to 2019.  However, that history does not render the January 2020 IEP inadequate.  The IEP's proposal to provide specially designed instruction to address John's orthographic processing deficits satisfied the requirements of the IDEA.

For the foregoing reasons, I **AFFIRM** the hearing officer's October 13, 2020, decision.

**SO ORDERED.**

**Dated: July 14, 2022**

_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**